# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| DON HARRIS, individually and as class representative of all others similarly situated,<br><br>  Plaintiffs,<br><br>    vs.<br><br>DAIMLERCHRYSLER CORP., and CHRYSLER, LLC,<br><br>  Defendant. | **CASE NO.**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>`FILED: MAY 7, 2008`<br>`08CV2638 J. N.`<br>`JUDGE DOW JR.`<br>`MAG. JUDGE COLE` |

Plaintiff, Don Harris, on behalf of himself and all others similarly situated, by his undersigned counsel, alleges, against Defendants DaimlerChrysler Corporation and Chrysler, LLC (hereafter referred to collectively as "Defendants" or "Chrysler"), the following upon personal knowledge as to his own acts, and upon information and belief, based on the investigation conducted by their counsel, as to all other allegations:

## I.    SUMMARY OF THE ACTION

1.    Plaintiff brings this class action Complaint for himself and on behalf of all other persons in the State of Illinois who purchased or leased a model year 1998 - 2004 Chrysler Concorde, Chrysler Sebring, Dodge Intrepid or Dodge Stratus ("Class Vehicles") equipped with a 2.7 liter V6 Engine (the "Engine").

2.    Each Class Vehicle is equipped with the same Engine.

3.    Each Engine in each Class Vehicle is defective by reason of an identical Design Defect (the "Design Defect") which is common to the Engines in all Class Vehicles. The Design Defect, as described in detail hereafter, causes the formation of Engine Oil Sludge ("Oil Sludge" or "Sludge").

4.    Oil Sludge is a waste product of degraded engine oil. This waste material, which includes hard carbon deposits, is inherently harmful to an internal combustion engine.

5.    The formation of Oil Sludge and resulting harm occurs in all Class Vehicles.

6.    The Engines in Class Vehicles are being damaged from first use and throughout the life of the Vehicle. The Engines suffer actual, identifiable, and measurable damage even though the user may not be contemporaneously aware that the damage is occurring.

7.    The Design Defect has caused and will cause thousands of Engines to suffer catastrophic failure. Such failure frequently occurs during the operation of Class Vehicles. Accordingly, the Design Defect common to the Engines of all Class Vehicles poses a serious and obvious safety risk and risk of injury or death to the operator and passengers in Class Vehicles and to other motorists.

8.    Defendants failed to properly test the Engine before the marketing of the Class Vehicles.

9.    Defendants also have made material misrepresentations and have suppressed and concealed material information regarding the Defective Design of the Engines in Class Vehicles. Defendants have intended to mislead the purchasing public through such misrepresentation and concealment for the purpose, among others, of continuing to market Class Vehicles and to avoid the expense of feasible preventative maintenance and repairs.

10.    Plaintiff alleges that Defendants are liable for costs of inspecting, preventative maintenance and proper lubrication oils, and of repairing or replacing the Defective Engines. Defendants are also liable for the diminished value of Class Vehicles, the payment of reasonable attorneys' fees and treble damages.

## II.    THE PARTIES

11.    Plaintiff Don Harris has been a resident of Illinois at all times relevant to this controversy. He currently resides in Chicago, Illinois.

12.    Defendant DaimlerChrysler Corporation is a foreign corporation, with its principal place of business and national headquarters located in Auburn Hills, Michigan. Defendant designs, manufacturers and sells motor vehicles throughout the United States under several prominent brand names including Chrysler® and Dodge®. In addition, the Vehicles are advertised, distributed and sold at multiple places of business in this district and the State of Illinois. These locations were and are maintained by this Defendant's dealers for the sale of the Vehicles and this Defendant has sold the years and models in question in the State of Illinois during the Class Period and presently.

13.    Defendant Chrysler LLC is a Delaware limited liability company, which, upon information and belief, is owned by Chrysler Holding, LLC, a limited liability company owned jointly by Defendant DaimlerChrysler and a subsidiary of Cerberus Capital Management, L.P. Upon information and belief, as of August 2007, the production and sale of Chrysler and Dodge motor vehicles is conducted by (or under the auspices of) Chrysler LLC. Further, upon information and belief, as of August 2007, Chrysler LLC assumed at least joint responsibility for any liabilities and/or obligations in connection with or arising out of the performance, operation, condition or servicing of Chrysler and Dodge motor vehicles, including, without limitation, the Class Vehicles.

### III.    JURISDICTION

14.    This Court has original jurisdiction over this Class action under 28 U.S.C. §1332(d)(2), (d)(5)(B), (d)(6) because (i) there are 100 or more Class members, (ii) there is an aggregate amount in controversy of at least $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least Plaintiff and the Defendants are citizens of different states.

15.    Venue in this Court is proper in that Defendants transacted business in this district and the conduct complained of occurred in this district, as well as elsewhere in Illinois.

## IV.    THE NATURE OF THE DEFECT

16.    The Engine in Class Vehicles operates based on internal combustion. Such Engines produce heat and require properly designed and properly functioning cooling and lubrication systems. Motor oil performs this dual purpose of cooling and lubrication in an internal combustion engine.

17.    Proper engine design requires that the temperature of the Engine be controlled. An adequate supply of motor oil and adequate circulation of this oil is an essential part of this design objective. If the supply of oil (sump size) is not adequate, and/or is exposed to excessive heat, the oil will prematurely degrade and form Oil Sludge.

18.    Proper engine design also requires the separation of hot "blow by" gases (created by combustion of gasoline) from the oil supply ("Positive Crank Case Ventilation" or "PCV"). These gases, if not properly ventilated, will also result in accelerated oil degradation and the formation of Oil Sludge.

19.    Oil Sludge is inherently harmful and damages the Engine in Class Vehicles because it causes the oil to lose its capacity to lubricate and cool the Engine. Oil Sludge also restricts the flow of oil to the moving parts of the Engine and/or results in complete oil starvation.

20.    The Defective Design of the Engine in Class Vehicles emanates from the excessive heat produced by operation of the Engine. As a result of this excessive heat, the specific factors which result in the formation of Oil Sludge include the following:

a.    An Engine oil sump capacity of only five quarts which is too small and otherwise inadequate given the excessive heat produced by the operation of the Engine. This sump capacity results in inadequate oil circulation, inadequate cooling, and accelerated oil degradation resulting in the formation of Sludge and carbon deposits which block oil passageways; and

4

b. A defectively designed and inadequate PCV system which does not adequately vent "blow by" gases, further resulting in accelerated oil degradation and the formation of Oil Sludge.

21. The Design Defect in the Engine in Class Vehicles causes the accelerated degradation of motor oil and formation of Oil Sludge in all Class Vehicles (the "Oil Sludge Malfunction"). The Oil Sludge Malfunction, and the resulting damage to the Engine, begins on the first day of operation of the Class Vehicles and continues throughout the life of the Class Vehicles.

22. The Oil Sludge Malfunction constitutes an actual manifestation of the Design Defect and actual damage, injury and harm to the Engine in the Class Vehicles. A direct consequence of the Oil Sludge Malfunction is the repetitive physical injury to Engine parts, including, but not limited to, excessive wear and tear which occurs on a constant and ongoing basis in all Class Vehicles, as well as the formation of carbon deposits, which block oil passageways and restrict oil circulation in the Engines.

23. The constancy of this excessive wear and tear on engine parts and restriction of the oil circulation in the Engines has caused actual mechanical failure in thousands of Class Vehicles, for which Class members have been forced to expend their own money in order to restore their Vehicles to full and safe operation.

24. As a result of the Oil Sludge Malfunction, all Class Vehicles have a diminished useful life, even if there has been no actual mechanical failure.

25. No amount of driver care or diligent engine maintenance can prevent or forestall the Oil Sludge Malfunction from occurring in the Class Vehicles – only design modifications of the Engine can correct the Design Defect.

26. As a consequence of the Design Defect, the maintenance regimen promulgated by Defendants (concerning both the kind of engine oil to be used and the interval at which this oil

should be changed) is incapable of preventing the Oil Sludge Malfunction – no matter how assiduously followed by a Class Vehicle user.

27.     Determining that a particular Engine has failed mechanically due to the Oil Sludge Malfunction, or that a particular Engine needs expurgation of Oil Sludge build-up, may be determined by quick, objective, inexpensive and standardized internal engine analysis, often involving a simple visual confirmation, which does not require any individualized or subjective fact-finding.    Indeed, it is only by means of such internal engine analysis that Oil Sludge formation or damage to engine parts can properly be detected and confirmed.

## V.    DEFENDANTS' INADEQUATE TESTING AND CONCEALMENT OF THE ENGINE DESIGN DEFECT

28.     The Design Defect of the Engine in Class Vehicles is not a matter that is known within the general public. This is because the information is technical in nature and because an Oil Sludge Malfunction, and its causal relationship to Engine failure, is not apparent to the ordinary consumer.    The dissemination of such information, which is proprietary, is also exclusively within the control of the Defendants.

29.     Defendants, because of their longstanding involvement in the design and manufacture of internal combustion Engines, were aware of the risk associated with the Oil Sludge Malfunction, and with the means available to prevent this Design Defect.

30.     The prevention of an Oil Sludge Malfunction is a decade's old automotive design objective. Before a particular engine is mass produced to the public, a proto-type of the engine is, or should be, operated under "engine sequence" conditions in which the oil is monitored to determine whether premature degradation will occur. Such testing also provides the basis for correcting the Malfunction through design modification.

31.     Another test method utilized to determine whether an engine malfunctions and produces Oil Sludge is through "field testing". This testing involves the monitoring of vehicles

that have been placed into use in the stream of commerce.

32.    The likelihood that the Engine in Class Vehicles would malfunction and produce Oil Sludge should have been apparent to Defendants by virtue of their design experience. Nevertheless, the Design Defect and the resulting Engine damage caused by the Oil Sludge Malfunction became known to the Defendants soon after they placed the Class Vehicles into the stream of commerce.

33.    Defendants discovered that the Engine in Class Vehicles was substantially more "hot-running" than anticipated, and that the excessive heat produced by the Engine was accelerating the degradation of the oil and forming hard carbon deposits. Defendants discovered that the 5 quart oil capacity it had designed for use in the Engine was wholly inadequate to cool the Engine and/or drain oil away from excessively hot engine surfaces. Defendants also discovered that the PCV system for the Engine was not functioning properly, which further contributed to accelerated oil degradation. Defendants thus discovered that the combination of these factors destined the Engine to experience the Oil Sludge Malfunction and accelerated Engine failure.

34.    Defendants also discovered from their study of the Class Vehicles that preventative measures could be undertaken by Defendants that would ameliorate the harm caused by the Oil Sludge Malfunction. These measures included the use of a high quality synthetic motor oil less sensitive to heat degradation, more frequent oil change intervals, and preventative inspection and cleaning of the engines in Class Vehicles.

35.    In addition, Defendants discovered soon after the Class Vehicles were placed into the stream of commerce what design modifications were necessary to eliminate the Oil Sludge Malfunction. These design changes included *at least* the use of a larger 6 quart capacity oil sump and a properly functioning PCV system. These relatively simple design modifications, which cost the Defendants pennies on the dollar compared to the cost of an engine failure, were not

implemented by the Defendants for any of the Class Vehicles.[1]

36.    As opposed to issuing recall notices to owners of Class Vehicles or to otherwise advise consumers of the Design Defect, and the preventative measures that could be taken to ameliorate the harm caused by the Defect, the Defendants continued to manufacture and distribute hundreds of thousands of Class Vehicles with actual knowledge that the Engines in these Vehicles were malfunctioning and not fit for their intended purpose.

37.    The Defendants sought to conceal the Oil Sludge Malfunction through various means, including keeping their definitive testing information secret, even from their own dealerships, and falsely attributing Oil Sludge related Engine damage to poor vehicle maintenance by consumers. The Defendants also sought to identify any consumer claims which it foresaw as creating a risk that its wrongdoing would become known in the public domain, and solicited contractual settlement and releases of such claims.

38.    The Defendants have occasionally admitted to some Class Vehicle owners or lessees by its words and action, that the Oil Sludge Malfunction should be covered by its warranties and denied this to others.  Defendants have thus maintained a secret warranty practice for some consumers while denying it for others, thereby engaging in an unfair, deceptive, arbitrary and unconscionable trade practice.

39.    Defendants have sought to conceal the Design Defect *because* the information is material to the decision whether to purchase one of its Vehicles. This deceptive practice has occurred in spite of the legal and equitable duties imposed on the Defendants to inform vehicle owners and prospective purchasers of the Oil Sludge Malfunction.

---

[1] Defendants have implemented these design modifications in subsequent versions of the 2.7 liter V6 engine.

40.     Defendants knowingly concealed material information about the Design Defect from consumers with the intent that they would rely on the concealment and purchase the Class Vehicles.

41.     Plaintiff alleges that Defendants had actual knowledge of the Design Defect (or should have known of the Design Defect) before the initial introduction of Class Vehicles into the stream of commerce.  Alternatively, Plaintiff alleges that Defendants had actual knowledge of the Design Defect shortly thereafter as a result of (a) investigation by Defendants' engineers and (b) information exchanged between Defendants and their suppliers of oil and oil additives.

## VI.    SAFETY RISKS

42.     The failure of the Engines in Class Vehicles will more likely than not occur when the Vehicle is in operation, resulting in a sudden and unexpected loss of power while the Vehicle is travelling on a public roadway.  This poses an obvious safety risk to the operator, any passengers, and to other motorists.

43.     The following reports by consumers of the Class Vehicles are illustrative of this unreasonable risk of harm:

> - "… almost got into an accident on 2 occasions because my car turned off on me while driving! once on the expressway and once while making a turn."
>
> - "One afternoon when I was driving to the post office, I heard a knocking noise coming from the car.  I was immediately worried so I was going to pull over.  While I was about to pull over, the engine died on me.  This almost caused an accident because I could not get out of the way from a car that was about to turn into a parking lot.  Thankfully, I used all of my strength and power to turn the steering wheel."
>
> - "My engine locked up on me while driving 12/11/2005 on my way home from a doctor visit with my 2 week old son in the car, I almost had an accident."
>
> - "As I was driving the engine froze up nearly causing accident."

- "Vehicle broke down going down highway while driving which could have caused accident."

- "Engine failed while driving, avoided accident."

- "Danger of accident on interstate because of engine failure."

- "Engine came apart without warning on highway at 65 mph.    Just missed being involved in serious & catastrophic accident."

44.    The Defendants have had actual knowledge of the safety risks associated with the Design Defect in the Engine for years and the Defendants have deliberately placed Class Vehicles into the stream of commerce with knowledge of these risks. Despite Defendants' knowledge, they concealed these safety risks from Class members and failed to alert Class members about the unreasonable risk of harm.

### VII.    DEFENDANTS' MAINTENANCE RECOMMENDATION COMPOUND ENGINE DESIGN DEFECT

45.    The Design Defect causes the Oil Sludge Malfunction in all Class Vehicles regardless of whether a Class member literally complies with Defendants' maintenance recommendations.   Moreover, Defendants' maintenance recommendations are improper and inadequate in several respects, given the Design Defect, and aggravates the Oil Sludge Malfunction resulting from the Design Defect.

### VIII.   THE PURPORTED EXCLUSION OF OIL SLUDGE AS PART OF DEFENDANTS' SCHEME

46.    The express warranty issued for Class Vehicles purports to exclude repairs related to the Oil Sludge Malfunction and to otherwise limit or exclude the rights of Class members to pursue related claims against Defendants based on the implied warranty of merchantability. Plaintiff alleges, on information and belief, that Defendants incorporated these purported exclusions precisely because Defendants were aware of the Design Defect in the Engines of Class Vehicles and knew that such Defect would cause the Oil Sludge Malfunction.

47.    Thus, Defendants wrongfully attempted to exclude from express and implied warranty coverage damage which Defendants knew would occur as a result of the Design Defect. In light of Defendants' knowledge of the Design Defect and the resulting safety risks, Defendants' purported attempt to exclude Oil Sludge from the express and implied warranty is unconscionable and constitutes elicit overreaching thereby rendering any such purported exclusion unconscionable and ineffective.

48.    Defendants intentionally concealed the Design Defect by engaging in conduct, including concealment of material facts, intended to hide detectable manifestations of the Design Defect and/or mislead Class members about the fact or effect of the Design Defect until after the warranty period had expired.

49.    Defendants thereby wrongfully and unconscionably sought to transfer the risk of ultimately repairing damage due to the Design Defect and Oil Sludge Malfunction from Defendants to unwitting purchasers or lessees of the Class Vehicles.

## IX.    DEFENDANTS' AFFIRMATIVE DUTY OF DISCLOSURE

50.    The Defendants had an affirmative duty to disclose the true facts relating to the Design Defect, the Oil Sludge Malfunction, and associated safety risks to purchasers and users of Class Vehicles and to the general public.

51.    The information the Defendants wrongfully suppressed and concealed was material to actions by Class members including the decision to purchase Class Vehicles and the maintenance and repair of Class Vehicles.

52.    Plaintiffs and Class members had a reasonable expectation that the Defendants would design, manufacture, market and distribute the Class Vehicles without the Engine Design Defect and without serious and significant safety risks and hazards.  Plaintiffs and the Class members also had a reasonable expectation that Defendants would design, manufacture, market,

and distribute Class Vehicles with a reasonable useful life and reasonable value undiminished by the Design Defect and Oil Sludge Malfunction.

53.    Specifically, Plaintiffs allege an affirmative duty to disclose and not to conceal the material facts relating to the Design Defendant and Old Sludge Malfunction based upon the following circumstances:

(a)    Defendant Chrysler had exclusive knowledge of the material information regarding the nature and extent of the Engine Design Defect and Oil Sludge Malfunction;

(b)    Defendant Chrysler was in a superior position to know the true facts relating to the Design Defect and the Oil Sludge Malfunction and Plaintiffs could not reasonably have discovered such information;

(c)    Chrysler intentionally and wrongfully concealed and suppressed the true facts with respect to the Design Defect and the Oil Sludge Malfunction with the intent to defraud the Plaintiffs and the Class Members;

(d)    Plaintiffs and Class Members were unaware of the material facts and would not have acted as they did, if Plaintiff and the Class Members had known of the concealed or express facts.  Specifically, Plaintiffs and the Class Members would not have purchased the Class Vehicles or would not have paid the same price for Class Vehicles;

(e)    The Design Defect and the Oil Sludge Malfunction pose significant safety risks and hazards to Plaintiff, Class Members, and members of the general public; and

(f)    As a result of the concealment and suppression of the material facts as alleged herein, the Plaintiffs and the Class Members have sustained actual economic damages.

## X.    PLAINTIFF'S CLAIMS

54.    In February of 1999, Plaintiff Don Harris purchased a 1999 Chrysler Concorde containing the Engine from Mancuri Chrysler Dodge in Oak Lawn, Illinois. Mr. Harris purchased his Vehicle new. Had Mr. Harris known of the Design Defect and the Oil Sludge Malfunction present in the Engine he would not have purchased this Vehicle.

55.    In October of 2001, Mr. Harris was driving his Vehicle on a public roadway when the Engine began to make unusual mechanical noises. Mr. Harris took the vehicle to Mancuri Chrysler Dodge for diagnosis of the problem, where he was informed that the Engine suffered major mechanical damage. The Vehicle was repaired under warranty; however, Mr. Harris was not informed that the Engine had failed due to the Design Defect.

56.    The Engine in the Vehicle failed a second time due to the Oil Sludge Malfunction in January of 2006, at which time Mr. Harris was informed that he would need to replace the Engine at an estimated replacement cost of $5,000. Mr. Harris was denied reimbursement for these repair costs by the Defendants.

## XI.    CLASS ACTION ALLEGATIONS

57.    Plaintiff brings this Class action pursuant to Fed. R. Civ. Procedure Rule 23 (a), and (b)(3) on his behalf and on behalf of the following two damages subclasses (hereafter collectively referred to as the "Classes"):

Subclass A - The Mechanical Failure Subclass

This subclass consists of all persons in the State of Illinois who purchased or leased a model year 1998-2004 Chrysler Concorde, Chrysler Sebring, Dodge Intrepid or Dodge Stratus equipped with a 2.7 liter internal combustion engine which failed mechanically due to Oil Sludge Malfunction, and for which that purchaser or lessee has or will incur engine repair costs.

Subclass B - The Oil Sludge Build-up Subclass

This subclass consists of all persons in the State of Illinois who purchased or leased a model year 1998-2004 Chrysler

Concorde, Chrysler Sebring, Dodge Intrepid or Dodge Stratus equipped with a 2.7 liter internal combustion engine which has not yet failed mechanically due to Oil Sludge Malfunction, and for which that purchaser or lessee has or will incur costs for inspection and/or cleaning of the engine.

58.    These Classes are composed of thousands of persons geographically dispersed throughout Illinois, the joinder of whom in one action is impractical. The Classes are ascertainable and identifiable. The precise number of members of the Classes can only be ascertained through discovery, which includes Defendants' sales, service, maintenance and complaint records. Questions of law and fact common to the Classes exist as to all members and predominate over any questions affecting only individual members.

59.    The issues of product Defect, as well as causation of each product Malfunction for every Class member, are subject to generalized proof in a single trial, and thus outweigh any issues in the proposed Class action which might be subject to individualized proof.

60.    The common legal and factual issues for the proposed Classes include the following:

a.    whether the Engine in the Class Vehicles have a common Design Defect;

b.    whether the Engine in the Class Vehicles are fit for their ordinary and intended purpose;

c.    whether the useful life of the Engine in the Class Vehicles is reduced as a result of the Design Defect and the Oil Sludge Malfunction;

d.    whether the Defendants sought to conceal the Design Defect from the public, and/or to suppress or misrepresent the existence of the Defect;

e.    whether the Class Vehicles were merchantable when Defendants placed these Vehicles into the stream of commerce and thereafter;

14

f.      whether the Defendants have engaged in an unconscionable commercial practice, including aggravated acts, as defined under Illinois's Consumer Fraud Act and Deceptive Business Act, 815 § ILCS 505/1, *et seq.*;

g.      whether the Defendants have been unjustly enriched to the detriment of the consumers owning or leasing the Class Vehicles;

h.      whether the Class members are entitled to an inspection and cleaning of the Engines in Class Vehicles;

i.      whether Class members are entitled to restitution;

j.      whether the Design Defect has resulted in diminished value of Class Vehicles, and

k.      whether the Class members are entitled to actual damages and if so, the appropriate amount thereof.

61.     Plaintiff's claims are typical of the claims of the Class members, as all such claims arise out of Defendants' conduct in: a) designing, manufacturing, marketing, advertising, warranting, distributing, selling and leasing the defective Class Vehicle; b) Defendants' conduct in concealing, suppressing or failing to disclose the Defect in the Class Vehicles and; c) the purchase or lease of the Class Vehicles by Plaintiff and Class members.

62.     Plaintiff will fairly and adequately protect the interests of the Class members and has no interests antagonistic to those of the Class members.  Plaintiff has retained counsel experienced in the prosecution of complex class actions, including consumer class actions involving deceptive trade practices, breach of warranties, product liability and Engine Design Defects.

63.     This Class action is appropriate for certification because questions of law and fact common to the Classes predominate over questions affecting only individual members. The product Malfunction which occurs is due exclusively to the Design Defect. The Class Vehicles

have all malfunctioned as a result of the same causative factors inherent in this flawed Engine design. Determining that a particular Engine failure has occurred as a result of the Oil Sludge Malfunction is able to be achieved by means of quick, objective, inexpensive and standardized analysis and does not require any individualized or subjective fact-finding. Such analysis is identical for all models which comprise the Class Vehicles.

64.    A Class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Classes is impracticable. Should individual Class members be required to bring separate actions, this Court and Courts throughout Illinois would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this Class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single Court.

### XII.    ESTOPPEL FROM PLEADING AND TOLLING OF APPLICABLE STATUTES OF LIMITATIONS

65.    Plaintiff hereby incorporates by reference each of the preceding allegations as though fully set forth herein.

66.    Defendants are estopped from relying upon any statutes of limitation by reason of their fraudulent misrepresentation, suppression and concealment of material facts, and any applicable statutes of limitation are tolled by such conduct.

### COUNT ONE:  UNJUST ENRICHMENT

67.    Plaintiff Harris incorporates the above allegations by reference as if set forth herein at length.

68.    This Count is brought again Defendant pursuant to Illinois' common law doctrine

of unjust enrichment.

69.    During the Class Period, Defendants manufactured and sold the Class Vehicles which are defective due to the Design Defect and resulting safety risks.

70.    Defendants had knowledge of the Design Defect in the Class Vehicles.

71.    Despite Defendants' knowledge of the defect in the Vehicles, Defendants have failed to disclose the existence of this defect (a material fact) to Plaintiffs and members of the Class at the times each of them purchased their Vehicles.

72.    During the Class Period, Plaintiff and members of the Class conferred upon Defendants, the benefit of payment for their Vehicles, which benefits were non-gratuitous.

73.    Defendants accepted or retained the non-gratuitous benefits conferred by Plaintiff and members of the Class despite Chrysler's knowledge of the design defect in the Vehicles. The Defendants had full knowledge and appreciation of such benefits.

74.    Retaining the non-gratuitous benefits conferred upon Chrysler by Plaintiffs and the Class under these circumstances make Chrysler's retention of the non-gratuitous benefits unjust and inequitable.

75.    Because Chrysler's retention of the non-gratuitous benefits conferred by Plaintiff and members of the Class is unjust and inequitable, Chrysler must pay restitution in a manner established by the Court.

## COUNT TWO: VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 § ILCS 505/1, *ET. SEQ.*)

76.    Plaintiff Harris incorporates the above allegations by reference as if set forth herein at length.

77.    At all times relevant herein Illinois's Consumer Fraud and Deceptive Business Practices Act ("ICFA") was in effect.  ICFA prohibits "unfair or deceptive practices".

78.    Plaintiff and the members of the Class are consumers.

79.    Defendants' acts and omissions, including Defendants' concealment and failure to disclose material facts relating to the Design Defect in Class Vehicles constitute deceptive acts and practices under the Illinois Consumer Fraud Act (ICFA).

80.    Defendants had actual knowledge of the Design Defect in Class Vehicles as alleged herein.

81.    Defendants intentionally concealed material facts relating to the Design Defect and intended that Plaintiffs would rely on such deception and concealment by purchasing Class Vehicles.

82.    The deception and concealment of material facts occurred in the course of Defendants' regular business involving trade or commerce.

83.    Defendants' wrongful acts and omissions, including the concealment of material facts, caused actual damages to the Plaintiffs and Class Members in that the information wrongfully concealed was material to the decision to purchase Class Vehicles.  Plaintiff and Class Members would not have purchased Class Vehicles, had they known the true facts relating to the Design Defect and the Oil Sludge Malfunction.

84.    Defendants' deception and concealment of material facts have proximately caused actual damages to the Plaintiffs including, but not limited to, the diminished value of Class Vehicles, the diminished useful life of Class Vehicles, costs of repair, and costs of necessary inspection and preventative maintenance.

85.    Because of the safety risks resulting from the Design Defect, Defendants' actual knowledge of the Design Defect, and Defendants' express and implied representations that the Class Vehicles were merchantable and were not defective, Defendants had a duty to disclose and not conceal the material facts relating to the Design Defect and Oil Sludge Malfunction in Class Vehicles.

86.    Defendants knew and intended that Plaintiff and Class Members would rely and

act to their detriment as a result of Defendants' deception and concealment of material facts relating to the Design Defect.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and on behalf of all others similarly situated, prays for judgment against Defendants as follows:

a. For an order certifying the Class and/or subclasses, pursuant to Fed. R. Civ. P. 23(b)(2) and/or (b)(3), appointing Plaintiff as representative of the Class and each Subclass, and appointing the law firms representing Plaintiff as counsel for the Class;

b. For compensatory damages incurred by Plaintiff and the Damages Subclass;

c. For appropriate injunctive relief, to be determined by the court;

d. For payment of costs of suit herein incurred;

e. For both pre- and post-judgment interest on any amounts awarded;

f. For payment of reasonable attorneys' fees and expert fees; and

g. For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all claims so triable.

Dated: May 7, 2008

Respectfully submitted,

DON HARRIS, individually and as class
representative of all others similarly
situated,

By: _____
One of his attorneys.

Edward T. Joyce
Rowena T. Parma
Edward T. Joyce & Associates, P.C.
11 South LaSalle Street
Suite 1600
Chicago, IL 60603
Telephone: (312) 641-2600
Facsimile:  (312) 641-0360

Randal R. Kelly, Esquire
Kirk D. Tresemer, Esquire
Darren A. Natvig, Esquire
Irwin & Boesen, PC
501 S. Cherry St., Suite 500
Denver, CO 80246
Telephone: (303) 320-1911
Facsimile: (303) 320-1915

Gary S. Graifman, Esquire
Michael L. Braunstein, Esquire
Kantrowitz, Goldhamer & Graifman
210 Summit Avenue
Montvale, New Jersey 07645
Telephone: (201) 391-7000
Facsimile: (201) 307-1086

Gary E. Mason, Esquire
The Mason Law Firm, L.L.P.
1225 19th Street, NW, Suite 500
Washington, D.C. 20038
Telephone:  (202) 429-2290
Facsimile:  (202) 429-2294

Peter J. McNulty, Esquire
McNulty Law Firm
827 Moraga Dr.
Los Angeles, CA 90049
Telephone: (310) 471-2707
Facsimile: (310) 472-7014

Steven L. Bloch, Esquire
Peter R. Kahana, Esquire
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-5707

Jonathon H. Waller. Esquire
Waller Law Office, PC
2140 11th Avenue South, Suite 222
Birmingham, AL 35205
Telephone: (205) 933-5421
Facsimile: (205) 933-5451

Andreas N. Akaras, Esquire
The Akaras Law Offices
4423 Lehigh Road, #308
College Park, MD 20740
Telephone: (301) 864-7763
Facsimile: (301) 864-7838

Alexander E. Barnett, Esquire
The Mason Law Firm, L.L.P.
1120 Avenue of the Americas, Suite 4019
New York, NY 10036
Telephone: (212) 362-5770
Facsimile: (917) 591-5227

***Attorneys for Plaintiff and the Classes***